IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DAFINIS FILHO, RAQUEL ERNEST, and CHANTEL LYNCH on behalf of themselves and all others similarly situated,<br><br>                                  **Plaintiffs**,<br><br>    -against-<br><br>OTG Management, LLC,<br><br>                                  **Defendant.** | Case No. 19-CV-8287 (ALC) (SN) |

**DECLARATION OF MOLLY A. BROOKS IN SUPPORT OF PLAINTIFFS'
UNOPPOSED MOTION FOR FINAL APPROVAL OF CLASS AND COLLECTIVE
ACTION SETTLEMENT AND PLAINTIFFS' UNOPPOSED MOTION FOR
APPROVAL OF SERVICE AWARDS AND CLASS COUNSEL'S FEES AND COSTS**

I, Molly Brooks, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury as follows:

      1.      I am a partner at Outten & Golden LLP ("O&G") in New York, New York, which is Plaintiffs' Counsel herein. I submit this declaration in support of Plaintiffs' Unopposed Motion for Final Approval of Class and Collective Action Settlement and Plaintiffs' Unopposed Motion for Approval of Service Awards and Class Counsel's Fees and Costs.

      2.      I have personal knowledge of the facts set forth herein and could competently testify to them if called as a witness at trial.

**My Background and Experience**

      3.      I received a Juris Doctor degree from Northeastern University School of Law in 2004. Since then, I have exclusively represented employees and unions in employment litigation and other employee rights matters.

      4.      I was admitted to the bar of the State of New York in 2005. I am also admitted to the bars of the United States District Courts for the Southern and Eastern Districts of New York,

and the U.S. Courts of Appeal for the Second and Ninth Circuits. I am a member in good standing of each of these bars.

5. From 2005 through 2008, I was associated with Cohen, Weiss and Simon LLP in New York, New York, where I represented employees and unions in labor and employment matters.

6. Since joining O&G in 2008, I have been engaged primarily in prosecuting wage and hour class and collective actions and class action discrimination cases.

7. I am a member of the National Employment Lawyers Association ("NELA") and its New York affiliate (NELA/NY). I have served as the Employee Chair of the American Bar Association's Labor and Employment Law Section Newsletter Committee and editor of the Newsletter, and on the New York City Bar Association's Labor and Employment Committee from 2009 to 2011.

8. I speak frequently on employment law issues, including wage and hour issues and discrimination issues. I have been a faculty member for continuing legal education programs focused on employment law sponsored by the American Bar Association, NELA, NELA/NY, and the New York City Bar Committee on Labor and Employment Law, among others.

9. O&G is experienced and nationally recognized for its expertise in litigating complex class and collective actions, including wage and hour cases like this one. *Id.*; *see also Capilupi v. People's United Fin., Inc.*, No. 15 Civ. 5247, 2018 U.S. Dist. LEXIS 167550, at *6-7 (E.D.N.Y. Sept. 27, 2018) (O&G attorneys "are well qualified, experienced, and have aggressively litigated this action, thereby demonstrating their adequacy as counsel for the class."); *Puglisi v. TD Bank, N.A.*, No. 13 Civ. 637, 2015 U.S. Dist. LEXIS 15966, at *9 (E.D.N.Y. Feb. 9, 2015) ("O&G has substantial experience prosecuting and settling nationwide wage and hour class and collective actions, and are well-versed in wage and hour law and class

action law and are well-qualified to represent the interests of the class."); *Perez*, 2014 U.S. Dist. LEXIS 130214, at *69 (E.D.N.Y. Sept. 16, 2014) (appointing O&G as class counsel and noting that "O & G has the requisite experience in handling class actions . . . , are well versed in the applicable law, and have the resources necessary to represent the NYLL Class fairly and adequately"); *Jacob v. Duane Reade, Inc.*, 289 F.R.D. 408, 423 (S.D.N.Y. 2013) (appointing O&G as class counsel because it has "experience in handling class actions, sufficient knowledge of the pertinent law, and sufficient resources to commit to this representation"), *aff'd*, 602 F. App'x 3 (2d Cir. 2015); *Kelly v. Brooklyn Events Ctr., LLC*, No. 17 Civ. 4600, 2019 U.S. Dist. LEXIS 156295, at *4 (E.D.N.Y. Sept. 10, 2019) (O&G attorneys "are experienced class action and employment lawyers with good reputations among the class action and employment bars"); *Houser v. Pritzker*, 28 F. Supp. 3d 222, 248, 255 (S.D.N.Y. 2014) (appointing O&G class counsel in nationwide Title VII litigation and noting that O&G "bring[s] to the case a wealth of class action litigation experience").

**Overview of Investigation, Litigation, and Settlement Negotiations**

10.     OTG is a privately-owned company that owns and operates restaurants and bars in major airport terminals across the United States. ECF No. 1 ¶ 1. Plaintiffs and the proposed Class members are current and former servers, bartenders, and other tipped workers ("Tipped Workers") who worked at OTG's restaurants at LaGuardia Airport, John F. Kennedy Airport, and Newark Liberty Airport. *Id.* ¶ 4. Prior to filing this Action, Class Counsel engaged in a substantial investigation that included a thorough investigation into OTG's compensation and timekeeping practices and interviews with multiple witnesses.

11.     Plaintiffs allege that OTG violated the Fair Labor Standards Act ("FLSA), the New York Labor Law ("NYLL"), and the New Jersey Wage and Hour Law ("NJWHL") by (1) failing to pay Tipped Workers the full minimum wage required under the FLSA, NYLL, and

3

NJWL; (2) failing to pay Tipped Workers for all regular and overtime hours worked in violation of the FLSA, NYLL, and NJWL; (3) retaining a portion of Tipped Worker's tips in violation of the FLSA, NYLL, and NJWL; and (4) failing to provide Tipped Workers with adequate wage notices and wage statements in violation of the NYLL.  OTG denies these allegations.

12. Plaintiffs filed this class and collective action on behalf of themselves and other Tipped Workers on September 5, 2019.  ECF No. 1.  On March 5, 2020, Plaintiffs filed their Motion for Court-Authorized Notice Pursuant to Section 216(b) of the Fair Labor Standards Act.  ECF No. 21.  On March 30, 2021, the Court granted in part Plaintiffs' motion for Court-authorized notice pursuant to 29 U.S.C. § 216(b) and permitted notice to be sent to Tipped Workers who worked for OTG at LaGuardia, Newark, and John F. Kennedy airports since September 5, 2016.  ECF No. 39.  On June 24, 2021, Plaintiffs sent notice to 2,153 putative collective members and 709 individuals joined the case as Opt-in Plaintiffs ("Opt-in Plaintiffs").

13. OTG informed Plaintiffs that approximately 557 of the Opt-in Plaintiffs had signed arbitration agreements and, on August 27, 2021, OTG filed a motion to compel those Opt-in Plaintiffs to arbitration and dismiss their claims from the case.  ECF No. 93.  The Court granted that motion on September 29, 2022.  ECF No. 147.  Accordingly, the Court held that 557 Opt-in Plaintiffs' claims must be litigated in arbitration, while 152 Opt-in Plaintiffs remained in the Collective.  *Id.* at 6.

14. In the fall of 2021, after the opt-in period closed and the Court had ruled on OTG's motion to compel arbitration, Plaintiffs' counsel reached out to OTG to invite it to consider attending mediation.  OTG agreed, and the parties engaged Stephen Sonnenberg, Esq., a well-respected mediator with significant experience involving employment law disputes.  The parties requested and the Court granted a stay of discovery pending the mediation.  ECF. No. 118 & 119.

15. Prior to the first mediation with Mr. Sonnenberg, OTG produced an updated class list, pay and hours data for Class Members, and a sample of tip and wage notices provided to Class Members. Plaintiffs produced documents from the Named Plaintiffs and seven Opt-in Plaintiffs in response to three documents requests from OTG.

16. The parties attended a full-day mediation on December 20, 2021, but were unable to come to an agreement at that time.

17. Following the December 2021 mediation, the Court lifted the discovery stay and the parties commenced discovery. The parties executed, and the Court approved an electronically stored information (ESI) protocol, ECF. No. 113, and the parties negotiated a sampling protocol to govern opt-in discovery. Both parties served and responded to written discovery requests, producing over 4,000 pages of documents. In addition to the Named Plaintiffs, 12 Opt-in Plaintiffs responded to OTG's separate Requests for Production and Interrogatories. Additionally, OTG took the depositions of the three Named and the parties were in the process of scheduling depositions of a sample of Opt-in Plaintiffs, OTG human resources employees, managers, and 30(b)(6) depositions.

18. On October 4, 2022, the Court directed the parties to meet and confer on whether a settlement conference would be productive. ECF No. 149. Subsequently, a settlement conference with Magistrate Judge Sarah Netburn was scheduled for December 21, 2022 and the Court ordered a stay of all discovery deadlines. ECF Nos. 151 & 152. The parties attended the settlement conference on December 21, 2022, followed by a second full-day conference on January 27, 2023, and a third session on March 14, 2023.

19. The parties reached an agreement in principle following the March 14 settlement conference. The parties then negotiated the Settlement Agreement and Release and fully executed the Agreement on June 8, 2023. *See* Exhibit 1 (Settlement Agreement and Release

("Settlement Agreement")). Throughout the entire process, the parties met and conferred (via telephone and email) with the mediator to facilitate the settlement discussions.

### The Settlement

20. The Settlement Agreement follows an extensive pre-suit investigation, formal discovery, and substantial arm's-length negotiations before, during, and after a private mediation session.

21. OTG has agreed to pay a Maximum Total Amount of $1,550,000 into a Settlement Fund. Ex. A § 1.21. This total includes payments to Participating Class Members; employee tax withholdings; employer payroll taxes; Court-approved service awards to the Named Plaintiffs; Court-approved attorneys' fees and costs; and costs of settlement administration. *Id*. Any uncashed checks remaining from the Gross Settlement Fund shall be redistributed to Participating Class Members, if economically feasible, and, if not, awarded to *cy pres* designee, Make the Road New York. *Id.* § 3.5(B).

22. The Class definitions remain the same and cover individuals to whom the Court ordered 216(b) notice in 2021. All Participating Class Members are receiving settlement payments according to an equitable allocation formula based on class definition and number of workweeks, as part of a Settlement of a protracted litigation with significant risk to any recovery at all.

23. As the Participating Opt-In Class Members have all signed arbitration agreements with OTG and have not retained Plaintiffs' Counsel to litigate those claims, the Allocation Formula reflects that this group of Class Members would have a substantially higher degree of risk in achieving recovery for their claims outside of this settlement.

### Notice of Settlement to Class Members

24. Plaintiffs' Counsel selected Analytics Consulting LLC as Settlement

Administrator.

25. After the Court granted preliminary approval of the Settlement, ECF No. 165, including approval of Plaintiffs' proposed Notices, Claim Form, and Reminder Postcard, and approved Analytics LLC ("Analytics") as the Settlement Administrator, Class Counsel began coordinating with the Settlement Administrator to disseminate notice to the Class Members.

26. Prior to sending notice, the parties reviewed and approved the settlement administration website, notices, claim form, envelopes, settlement administrator script for answering questions for Class Members, and text message language.

27. In late August 2023, shortly before the September 5 Bar Date, Counsel for OTG contacted Plaintiffs' Counsel and informed them that, due to an unintentional clerical error, 176 Class Members were excluded from the Class List.

28. The parties conferred and OTG agreed to bear the costs related to sending notice to the new Class Members and increase the settlement fund by a proportional amount to ensure that all estimated Class Members' recoveries will be unaffected by the addition of the 176 Class Members. The Court approved this change and also approved an updated notice regarding the change of the Final Fairness Hearing date. On December 29, 2023, Class Counsel learned that the Settlement Administrator, in error, only sent the notice to the Opt-in Class Members.

29. The increase to the settlement fund was $35,823.99, amounting to a new total gross settlement amount of $1,585,823.99.

30. During the settlement notice period, Class Counsel responded to inquiries from 66 Class Members regarding the Settlement. A number of Class Members affirmatively reached out to Class Counsel confirming the information in the settlement notice regarding how to participate in the settlement, indicating Class Members' enthusiastic support.

31. No Class Member opted out of the Settlement. One Class Member submitted a

statement both opting out and objecting to the Settlement.

32. Settlement Administrator and Class Counsel contacted the Class Member and notified the Objector that she could not both opt out and object.

33. The Objector chose not to opt out of the Settlement and instead participate and assert her objection. The Objector was informed of the change of the date of the Final Fairness Hearing.

**Final Settlement Approval of the Rule 23 Settlement is Warranted**

34. At all times during the parties' settlement negotiations, the parties' respective counsel argued and bargained vigorously on behalf of their clients. OTG mounted a strong defense to the claims Plaintiffs asserted at every stage of the litigation.

35. The parties have already engaged in significant discovery over a period of several years and were set to embark on depositions of numerous opt-in Plaintiffs and corporate representative witnesses, as well as class certification, decertification, and summary judgment motion practice. If the Court denied summary judgment, a complex trial would have been necessary to evaluate OTG's defenses to Plaintiffs' allegations, including the extent of off-the-clock and overtime work performed by Tipped Workers, the time Tipped Workers spent on different types of work, and the allocation of Tipped Workers' tips. Preparing for trial, particularly a class trial, would have consumed tremendous amounts of time and resources. Additionally, any judgment would likely be appealed, thereby extending the duration of the litigation.

36. Plaintiffs faced risks in establishing liability and damages on a class basis. OTG likely would have argued that differences in timekeeping instructions among managers, airports, and restaurant locations would prevent the class certification and would warrant decertification of the collective. In addition, even if Plaintiffs prevailed in obtaining class certification and in

maintaining collective certification, the fact-intensive nature of Plaintiffs' off-the-clock and minimum wage claims involves risk at trial. *See, e.g.*, *Morris*, 859 F. Supp. 2d at 620 ("[T]he fact-intensive nature of Plaintiffs' off-the-clock claim presents risk. The proposed settlement eliminates this uncertainty."). Plaintiffs would have to establish the total amount of time Tipped Workers at different airports and restaurants each spent performing side work, as well as establishing the amount of time that each Tipped Worker worked off the clock, which are complicated and fact intensive analyses.

37. Approximately 2,110 Class Members signed arbitration agreements with OTG. Arbitrating their claims on an individual basis would have presented significant risk and would have required the investment of significant time and financial resources.

38. OTG's ability to withstand a greater judgment is a neutral factor but the Settlement eliminates the risk that Plaintiffs and Settlement Class Members may not recover anything.

39. Participating Class Members will receive a gross payment, after requested fees and costs but prior to taxes, of approximately $357.35 on average from the Settlement. *See* Ex. 4 ¶ 28.

40. Individual class members have not expressed an interest in controlling the prosecution of the action and Plaintiffs are not aware of any cases that have been brought against Defendant by class members on an individual basis or the same claims.

41. O&G has done substantial work identifying, investigating, negotiating, and settling Plaintiffs' and putative Class Members' claims.

**The FLSA Settlement Should Be Approved**

42. The Settlement in this case easily meets the standard for approval. The Collective Fund of $1,585,823.99, is substantial, especially in light of the considerable risks Plaintiffs and

9

the Participating Class Members faced.

43. Plaintiffs faced significant risk to maintaining the FLSA Collective. OTG would have aggressively pursued discovery from Plaintiffs and the FLSA Collective to demonstrate that they – tipped workers – were not similarly situated with respect to their wage claims, and would have moved to decertify the collective.

44. If Plaintiffs succeeded in opposing motion, they would face significant risk to surviving the dispositive motions phase and at trial. Even if Plaintiffs could maintain collective treatment through trial, at the damages phase Plaintiffs would have to defeat OTG's arguments challenging the number of hours Plaintiffs are owed in unpaid wages, and that the fluctuating workweek applies to any damages calculations.

45. The Settlement was the result of more than four years of litigation before the district court and substantial arm's-length negotiations between experienced counsel assisted by a private mediator and Magistrate Judge Netburn.

**Plaintiffs' Service Awards Should be Approved**

46. Named Plaintiffs Filho, Ernest, and Lynch made important contributions to the prosecution and fair resolution of this action on behalf of the Class over several years of litigation.

47. All three Named Plaintiffs were continuously involved in the prosecution of the case, including a pre-suit investigation and negotiation dating back to early 2019.

48. They each brough particular value to the case because none of the Named Plaintiffs executed arbitration agreements with OTG, and Plaintiff Filho's work in New Jersey allowed Plaintiffs to plead a New Jersey Rule 23 class, and Plaintiffs Ernest and Lynch's work in New York allowed Plaintiffs to plead a New York Rule 23 Class.

49. All three Named Plaintiffs participated in multiple interviews during the

investigation stage, to aid Class Counsel in assessing the claims, preparing the demand letter, conferring with counsel with OTG prior to filing the lawsuit, and eventually filing the complaint.

50. Each Named Plaintiff carefully considered whether to serve as class representative, with the understanding that their names would be on publicly filed court documents and that they would have the responsibility to make decisions in the best interest of the class.

51. All three Plaintiffs searched for and provided documents related to their employment with OTG early on in the litigation, and then conducted multiple rounds of additional searches once discovery began in earnest.

52. Each Named Plaintiff submitted a declaration in support of Plaintiffs' 216(b) motion and participated in additional interviews with Class Counsel while drafting the declarations.

53. The Named Plaintiffs spent a significant amount of time speaking with Class Counsel to allow them to gather information for the initial disclosures and Named Plaintiffs' interrogatory responses.

54. Each of the Named Plaintiffs took time off of work to attend approximately three multi-hour deposition preparation sessions and took a day off of work to appear for an all-day deposition.

55. Throughout the litigation, the Named Plaintiffs were involved in discussing strategy for each stage of the case.

56. During months of settlement negotiations, all three individuals provided Class Counsel with crucial factual information and consulted about settlement strategy.

57. They also were in frequent contact with Class Counsel as to the status of negotiations and next steps.

58. The Named Plaintiffs reviewed the Settlement Agreement with Class Counsel and executed it.

59. Although the Named Plaintiffs were not employees of OTG when they participated in this case, all three nevertheless faced the risk that their current or future employers might discriminate or retaliate against them for being involved in this case if and when they learned of their involvement in the lawsuit, which has been on the public record since September 2019.

**Class Counsel's Fees and Costs Should be Approved**

60. Class Counsel's fees and costs request is fair and reasonable. The requested attorneys' fees represent approximately one-third of the monetary settlement for the Class.

61. Outten & Golden LLP ("O&G"), as Class Counsel, has been without compensation, and its entitlement to payment has been wholly contingent upon achieving a good result. Counsel undertook to prosecute this action without any assurance of payment for their services, litigating this case on a contingent basis in the face of significant risk. Due to the contingent nature of the customary fee arrangement, lawyers make this investment with the very real possibility of an unsuccessful outcome and no fee of any kind. Class Counsel stood to gain nothing in this case if it was unsuccessful.

62. This is the percentage to which the Named Plaintiffs agreed in their retainer agreements if the case was settled on a collective or individual basis and is in line with attorneys' fees awarded in this Circuit for employment cases.

63. Class Counsel have spent approximately 3,366.8 attorney, paralegal, and support staff hours investigating, litigating, and negotiating the settlement of this case.

64. Multiplying these hours by the hourly rate of each attorney, paralegal, and staff member results in a lodestar amount of $1,739,857.50. The requested fee represents

approximately 28.7% of Class Counsel's actual lodestar to date.

65. Class Members were apprised of this request for service awards and attorneys' fees and costs in the Court-approved Notices of Settlement ("Notices"), and no Class Member objected to these aspects of the Settlement.

66. Class Counsel's requested fee of $500,000 represents only approximately 28.7% of its actual lodestar to date – a negative multiplier.

67. Class Counsel's hourly rates are reasonable. Courts in this Circuit have repeatedly approved hourly rates like Class Counsel's as reasonable. Further, the rates sought by Class Counsel are routinely paid by clients seeking hourly attorney work, including on wage and hour matters.

68. At all times, Class Counsel used a small team of core attorneys in order to minimize duplication of efforts and maximize billing judgment and made every effort to have the work performed by the attorney or paralegal with the lowest hourly rate who was able to perform it effectively. In addition, Class Counsel's contemporaneous time records were carefully reviewed and duplicative work, as well as *de minimis* time billed by attorneys and staff who had little participation in the action, was removed (for example, Class Counsel proactively removed any attorneys or staff who worked fewer than five hours on this matter).

69. As outlined above and in attached Exhibits, Class Counsel's time was spent on tasks necessary to the successful prosecution of this wage and hour class action.

70. Plaintiffs vigorously prosecuted this action, by filing an early 216(b) motion; overseeing the opt-in notice administration, during which more than 700 individuals joined the case; opposing OTG's motion to compel arbitration – including by interviewing dozens of witnesses and collecting a dozen declarations regarding OTG's arbitration program; briefing a request to include late opt-in plaintiffs in the collective; engaging in extensive ESI negotiations;

preparing and defending the depositions of the Named Plaintiffs; reviewing documents; collecting documents and interrogatory responses from Opt-in Plaintiffs, fielding hundreds of inquiries from class members over the duration of the case, preparing for three full-day mediations; negotiating the term sheet and long-form settlement agreement. Thereafter, Class Counsel spent significant time working to secure preliminary approval of the settlement and supervise the notice process.

71. The requested fee, however, is not based solely on time and effort already expended. It is also meant to compensate Class Counsel for time that will be spent administering the settlement in the future. In Class Counsel's experience, overseeing the final steps of the settlement process will require an ongoing substantial commitment.

72. Class Counsel anticipate that they will incur significant additional fees interacting with the settlement administrator and fielding Class Members' questions.

73. Class Counsel's lodestar will also grow as they continue to finalize the settlement process, prepare for the Fairness Hearing, and handle Class Member questions after approval.

74. The lawyers involved in negotiating the settlement collectively have decades of experience with wage and hour litigation and settlements, and all of that experience was brought to bear to achieve the results of this case. Even so, Class Counsel prosecuted the claims at issue efficiently and effectively, making every effort to prevent the duplication of work.

75. The primary attorneys and staff who worked on this matter, besides myself, were:

    a. Hannah Cole-Chu is an Associate at O&G and a member of the firm's Class & Collective Action Practice Group. Prior to joining O&G, she clerked for the Honorable Alvin W. Thompson of the U.S. District Court for the District of Connecticut. She received her B.A. from Bard College and her J.D., magna cum laude, from the University of Maryland Francis King Carey School of Law.

14

    During law school, Ms. Cole-Chu was Editor in Chief of the Maryland Law Review and Co-President of the Maryland Public Interest Law Project.

b. Amy Maurer is an Associate at O&G in New York and a member of the firm's Class Action Practice Group. Prior to joining the firm in May 2021, Ms. Maurer was a fellow at the National Center for Law and Economic Justice. Ms. Maurer received her J.D. from Harvard Law School in 2019. She received her B.A. from Washington University in St. Louis in 2012.

c. Jalise R. Burt was an Associate at O&G from 2017 to 2020, and a member of the firm's Class Action Practice Group. Prior to joining the firm in November 2017, Ms. Burt clerked for the Honorable Ronald L. Ellis, United States Magistrate Judge for the Southern District of New York. As an Equal Justice Works Fellow at the New York Civil Liberties Union, Ms. Burt represented individual students facing suspensions and advocated for school climate and discipline reform at the state and local levels. Ms. Burt received her J.D. from the Georgetown University Law Center (GULC) in 2014 and her B.A., cum laude, from the University of Florida in 2011. While at GULC, Ms. Burt was the Managing Editor for the Georgetown Journal of Law and Modern Critical Race Perspectives. Ms. Burt was also a student attorney in the Juvenile Justice Clinic and held internships at the U.S. Department of Education, Office for Civil Rights; Advancement Project; and the American Civil Liberties Union's LGBT and AIDS Project. Ms. Burt is the recipient of GULC's Lorri L. Jean Student Award for Excellence in LGBTQIA Leadership and Advocacy.

d. Rania Tootla is a paralegal at O&G. Prior to joining O&G in June 2018, Rania attended the University of Michigan, where she received University Honors and

earned a B.A. in Women's Studies and Political Science. Rania's previous experiences include serving as a student investigator for the Washtenaw County Public Defender's Officer in Ann Arbor, MI and working as an office assistant at Tootla & Associates, healthcare specialists in Waterford, MI.

e. Alex Muino is a paralegal at O&G. Prior to joining O&G in June 2018, Ms. Muino graduated from Pace University with a B.A. in Peace and Justice Studies and Modern Languages and Cultures with a minor in Translation.

76. Here, Class Counsel respectfully posit that they achieved excellent results in this complex wage and hour matter, while risking the possibility of receiving nothing for their efforts. Cases for unpaid wages based on off-the-clock work are complex, fact-intensive cases that typically require a significant record to establish the propriety of class certification, liability, and damages.

77. This case is no exception, with more than 3,000 Class Members, and fact-intensive FLSA, NYLL, and NJWHL claims involving the OTG's liability for work Class Members performed off-the-clock.

78. With respect to costs, Class Counsel's expenses were incidental and necessary to the representation of the class and are in line with costs charged to individual clients who pay out of pocket.

79. These expenses include the cost of administering 216(b) notice to more than 2,000 potential collective members, mediation costs, legal research, deposition transcripts, maintaining a case website, fees for hosting client and discovery documents on Plaintiffs' document review platform, filing fees, attorney travel, postage, and printing.

80. The settlement administration activities already undertaken and those yet to be conducted (including Settlement distribution) are necessary to effectuate this Settlement.

**Exhibits**

81. Attached hereto as **Exhibit 1** is a true and correct copy of Settlement Agreement and Release.

82. Attached hereto as **Exhibit 2** is a Lodestar and Hours Summary Chart.

83. Attached hereto as **Exhibit 3** is a Costs Summary Chart.

84. Attached hereto as **Exhibit 4** is the Declaration of Shari Lynne Grayson of Analytics LLC.

Dated: January 2, 2024                                        __/s/Molly Brooks__
       New York, New York                              Molly Brooks